**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| ADRIENNE A. BASSUK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-336 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Adrienne Bassuk brought this lawsuit under the Federal Tort Claims Act alleging that the United States is liable to her for personal injuries Bassuk sustained when she slipped and fell in a vestibule at a Social Security office. The case was tried to the bench on September 15, 2020. The parties filed post-trial briefs, proposed findings of facts and proposed conclusions of law on October 15, 2020. Plaintiff's Post-Trial Brief (ECF No. 57), Plaintiff's Proposed Findings of Fact (ECF No. 58); Defendant's Post-Trial Brief (ECF No. 59), Defendant's Proposed Findings of Fact (ECF No. 60). On October 30, 2020, the parties filed their post-trial response briefs. Plaintiff's Post-Trial Reply Brief (ECF No. 61); Defendant's Response to Plaintiff's Post-Trial Brief (ECF No. 62).[1]

As detailed below, the Court rules in favor of the Plaintiff on her claim for negligence, enters judgment in favor of Plaintiff Adrienne Bassuk and against Defendant United States of America, and awards damages to Plaintiff in the amount of $1,000,000. The Clerk of the Court is directed to enter judgment accordingly.

---

[1] The trial transcript appears at ECF No. 56 and is cited in this Order as "Tr., p. _."

**DISCUSSION**

**I. Background.**

On August 15, 2016, Adrienne Bassuk was entering the Social Security Administration office located at 2122 Lincolnway Court in Fort Wayne, Indiana, for the purpose of checking on benefits resulting from the recent death of her husband. As Bassuk entered the foyer area of the SSA office, she slipped and fell. Bassuk contends that "[a]s a result of her fall, [she] sustained serious personal injuries and has incurred damages that include, but are not limited to, medical expenses, pain, suffering, emotional distress, permanent impairment and disfigurement, and loss of enjoyment of life's activities." Complaint, p. 2. Bassuk filed a federal tort claim with the SSA on May 17, 2018, which the Administration denied on August 21, 2018. Bassuk brought this action against the United States under the Federal Tort Claims Act. The parties do not dispute the "who, what, when" facts of the incident: Ms. Bassuk fell in the vestibule at the Social Security office on the morning of August 15, 2016, and sustained injuries. What is in dispute in this case is the "why." Ms. Bassuk alleges that her fall was the result of the Defendant's negligence, while the United States insists that it was not negligent, i.e., that it did not breach its duty of care, and that Ms. Bassuk's fall was the result of her own negligence and/or the result of her left knee "giving out."

**II. Findings of Fact.**

The Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Rule 52(a) directs the Court to separately set out its findings of fact and conclusions of law in an opinion or a memorandum. Fed.R.Civ.P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state

its conclusions of law separately. The findings and conclusions may be stated on the record after

the close of the evidence or may appear in an opinion or a memorandum of decision filed by the

court."). To the extent that any findings of fact are more properly construed as conclusions of

law, or vice versa, they should be construed as such. The Court's findings and conclusions are

based on the stipulated facts, the records allowed into evidence and the testimony presented at

trial. The findings are also premised on the Court's credibility determinations after observing

each of the witnesses testify in-person at trial.

### A. Stipulated Facts.

The parties stipulated to the following facts, which the Court adopts as part of its findings

of fact:

1. It was raining lightly when the Plaintiff arrived at the Social Security Administration building
and she observed that the ground outside was wet.

2. The Plaintiff was alone when she fell and no one witnessed her fall.

3. On the morning of her fall, the cleaning contractor had finished cleaning the lobby/vestibule at
8:56 a.m. and left the floor dry.

4. Plaintiff was driven to the Social Security Administration office by Anthony Henry who was
still outside at the time of Plaintiff's fall and did not witness her fall.

5. When Mr. Henry entered the vestibule area, he noticed that the floor appeared wet from people
walking in and out with water on their shoes or umbrellas, although he did not see puddles or
leaks.

6. The Social Security Administration Manager, Jaimi Dohrman, and Operations Supervisor,
Shaquayia Eagans, as well as a security guard, responded to the vestibule after the Plaintiff's fall.

7. Ms. Eagans observed footprints from the rain, but no standing water.

8. Ms. Dohrman observed wet areas on the vestibule floor, but no puddles.

9. Later, the day of the incident, Ms. Dohrman prepared an Incident Report that stated that Mrs.

3

Bassuk fell at 11:30 a.m. and stated as follows:

> A visitor slipped and fell in the foyer upon
> entering the building. There had been
> heavy rainfall and there were some wet
> areas in the foyer. Caution signs were on
> display in the lobby but not in the vestibule
> itself.

10. The Social Security Administration office was busy that day and there were a lot of cars in the parking lot when Plaintiff arrived.

11. All visitors to the Social Security Administration office must pass through the vestibule area before entering the lobby of the building through a set of double doors.

12. The warning sign had been placed earlier in the lobby area because it was raining outside.

13. The Defendant was aware that the floor mat and the tile floor would be slippery when they were wet.

14. Prior to the Plaintiff's fall, there were no warning signs posted in the vestibule area and no one from the Social Security Administration office took action to clean up water that was on the floor in the vestibule area from the time it started raining that morning until the Plaintiff's fall.

15. Mr. Henry arrived in the building approximately thirty (30) seconds after the Plaintiff entered the building and, upon his arrival, he observed the security guard standing near the Plaintiff, who was laying on her back on the floor in the vestibule.

16. Mr. Henry did not recall seeing a floor mat in the vestibule, but did notice the floor was wet from people walking in and out.

17. The Plaintiff has been billed for necessary medical treatment related to the injuries suffered in the subject fall from the following providers and in the following amounts:

| Provider | Amount |
| --- | --- |
| Three Rivers Ambulance Authority | $2,741.20 |
| Emergency Medicine of Indiana, LLC | $535.01 |
| St. Joseph Hospital | $4,776.29 |
| Lutheran Hospital | $1,676.00 |
| Lutheran Orthopedic Hospital | $97,035.86 |
| Fort Wayne Orthopaedics, LLC | $15,982.00 |
| Summit Radiology, PC | $406.00 |

| | |
|---|---|
| Associated Anesthesiologists | $2,830.00 |
| St. Anne Randallia Place | $34,020.83 |
| Northeast Medical Associates, PC | $115.00 |
| James Medical | $481.50 |
| Grandview Pharmacy | $201.82 |
| | |
| TOTAL | $160,801.51 |

18. The above medical bills were paid and/or adjusted by the following:

| | |
|---|---|
| Medicare | $49,790.20 |
| Anthem Blue Cross Blue Shield | $7,632.44 |
| Paid by Plaintiff | $5,300.39 |

19. In addition to the expenses itemized in paragraph Q, Plaintiff has incurred expenses for in-home nursing care/assistance from the following:

| | |
|---|---|
| Angel Corps. | $119,584.39 |
| Dorian Maples Associates | $3,098.00 |
| Lynn Schele | $6,091.79 |
| Cynthia Keller | $3,330.00 |
| | |
| TOTAL | $132,104.18. |

20. The Plaintiff was born on December 30, 1948 and, according to the Social Security Actuarial Life Tables, has a life expectancy of an additional 15.82 years.

21. The Plaintiff filed her Notice of Claim for Damage, Injury, or Death against the Social Security Administration seeking total damages of $1,000,000 on May 14, 2018, which claim was denied by the Social Security Administration on August 21, 2018.

The parties stipulated to the expenses enumerated in findings of fact 18 and 19. See

Plaintiff's Proposed Findings of Fact, pp. 1-4; Defendant's Proposed Findings of Fact, p. 15. The

United States, however, does not stipulate that the amounts billed for these services were

necessary or related to the accident. The Court discusses the issue of damages below.

**B. Court's Findings of Fact.**

**1. Findings of fact relevant to liability.**

5

22. On August 15, 2016, it had begun raining at approximately 9:20 a.m. and had continued to rain consistently throughout the morning prior to Plaintiff's fall. (Defendant's Trial Exh. H.)

23. Plaintiff entered the Social Security Administration office and began to walk towards the doors leading to the lobby when she felt her foot slip on the wet floor and fell on the tile floor with her head facing towards the front of the building after her fall. (Tr. pp. 19, 20; Plaintiff's Trial Exh. 13 and Defendant's Trial Exh. P.)

24. The tile floor was wet as a result of visitors to the Social Security Administration office entering the vestibule area from outside where it had been raining for approximately two hours prior to the Plaintiff's fall. (Tr. pp. 89, 90.)

25. Although the Plaintiff did not notice the water on the tile floor before she slipped and fell, she saw that the floor was wet after she fell and felt that it was wet because her shorts were wet from laying on the floor after she fell. (Tr. p. 19, 22.)

26. No photos were taken to show the condition of the vestibule area the day of Plaintiff's fall. (Tr. p. 128.)

27. The wet condition of the tile floor created a slip hazard known to the Defendant and the condition had existed for a sufficient period of time that it should and could have been discovered by the Defendant prior to the Plaintiff's fall had it exercised ordinary care. (Tr. pp. 113-114, 125-126.)

28. The Defendant had constructive knowledge that the condition of the vestibule area involved an unreasonable risk of harm to its invitees such as the Plaintiff.

29. There was no wet floor/warning sign posted in the vestibule area. (Tr. pp. 89, 117, 144.)

30. When Jaimi Dohrman, the acting Manager of the Social Security Administration office that day entered the vestibule area, she asked the security guard where the wet floor/caution sign was. (Tr. pp. 89, 99.)

31. The EMS arrived within approximately fifteen minutes after the Plaintiff's fall. (Defendant's Trial Exh. E.)

32. The Plaintiff was observed laying on her back and complaining of severe pain in her left leg and knee area. She was administered two doses of Dilaudid, a pain medication, one before leaving the scene and one while in transit to St. Joseph Hospital. (Defendant's Trial Exh. E.)

33. The EMS technician, Ryan Zehring, included in his report the following statement:

"Patient states her left knee gave out on her as she entered Social Security offices." (*Id.*)

34. Mr. Zehring testified that the Plaintiff did not state that the cause of her fall was her knee giving out. (Tr. p. 204.)

35. Plaintiff did not remember making such a statement, but denies that her fall was caused by her knee giving out. (Tr. p. 24.)

36. The Court finds that the preponderance of the evidence establishes that the Plaintiff's fall was caused by her slipping on the wet tile floor and not, as Defendant claims, her knee giving out.

This factual finding is supported by the following evidence:

    A. The Plaintiff's testimony that she slipped and fell on the hard tile floor. (Tr. pp. 19, 20.)

    B. The Plaintiff's statement to Mr. Henry, immediately upon his arrival in the vestibule area, that she had slipped and fallen. (Tr. p. 86.)

    C. The SAFE report prepared by Shaquayia Eagans the day of the fall stating "woman slipped in foyer while entering the Social Security office at approximately 11:30." (Plaintiff's Trial Exh. 6.)

    D. Email report from Jaimi Dohrman dated August 15, 2016 at 3:30 p.m. stating "on 8/15/2016 at 11:30 a.m. a visitor slipped and fell in the foyer upon entering the building. There had been heavy rainfall and there were some wet areas in the foyer." (Plaintiff's Trial Exh. 7.)

    E. St. Joseph Hospital Emergency Department chart stating "Syncope was not the cause of her fall. She slipped on a wet surface." (Plaintiff's Trial Exh. 8.)

    F. Lutheran Hospital of Indiana history and physical report stating "this is a 67 year old female who slipped and fell earlier today on wet tile while she was at the Social Security office." (Plaintiff's Trial Exh. 9.)

    G. Testimony of Dr. Matthew Beuchel stating that the Plaintiff fell on a wet floor at the Social Security office. (Deposition Tr. pp. 2, 3, 24, 25.)

    H. Federal Protective Service Report dated August 15, 2016 stating "I heard a noise and yell coming from mezzanine. I checked it out and a woman was lying on floor saying she slipped and fell." (Plaintiff's Trial Exh. 10.)

37. The Court finds that the Plaintiff has established, by a preponderance of the evidence, that Defendant breached its duty to exercise reasonable care for the safety of the Plaintiff and that the Plaintiff's fall was the direct and proximate result of the Defendant's breach.

38. The Court further finds that no evidence has been presented that the Plaintiff failed to exercise reasonable care for her own safety and, accordingly, the Court finds that there is no comparative fault to be attributed to the Plaintiff.

39. Plaintiff's medical records indicate that she was diagnosed with arthritis in her knees in 2014. Exhs. I1, p. 3; I2, p. 3).

40. Plaintiff slipped and fell on previous occasions, including in 2004 at the County building (Tr., p. 64; Exhs. I7 & J), in 2008 at home (although Bassuk testified that she had no recollection of this incident) (Tr., p. 66), in 2011 when she slipped on ice (*id*.), and in 2015 when she fell at a Walgreens store (*id*.).

41. The weather report for the day of the incident shows that there was "light rain" starting at 9:20 a.m. that continued except for two periods of "rain" (one spanning 2 minutes, and one 18 minutes) until Plaintiff arrived at the SSA facility around 11:30 a.m. (Defendant's Trial Exh. H.)

42. It was lightly misting when Plaintiff arrived at the SSA office. (Tr., p. 15; p. 85.)

43. Patrons entered the SSA building into a vestibule that is approximately 12' x 10', and which has a tile floor. (Tr., p. 42; Plaintiff's Trial Exhs. 3-4; Defendant's Trial Exhs. B-C.)

44. At the time of Plaintiff's fall, there were two heavy duty fabric mats present on the floor of the vestibule, covering portions of the tile floor. (Tr., p. 47, 48, 120-121, 148, 166.)

45. A third-party cleaning company cleaned the vestibule on a daily basis, which included mopping the floor of the vestibule, and did so on the day that Plaintiff fell, having completed its work before the SSA facility opened to the public at 9:00 a.m. (Tr., p. 143, 162-163.)

46. At the time of Plaintiff's fall, there was a wet floor sign up in the lobby, but not the vestibule. (Tr., p. 117, 120, 136, 139, 144.)

### 2. Findings of fact relevant to damages.

47. Following her fall, the Plaintiff was transported by ambulance to the St. Joseph Hospital Emergency Room where she was examined and diagnosed with a distal femur fracture. She was then transferred to Lutheran Hospital (Plaintiff's Trial Exhs. 8 and 9).

48. On August 16, 2016, Dr. Matthew Beuchel performed surgery to repair her fracture which he described as having extended into the knee joint. The surgery included placing a plate and screws to hold the fracture in place, as there was extensive crushing of some of the bone. This initial surgery also included some bone grafting. (Beuchel Deposition Tr. pp. 3, 4.)

49. The plates and screws used to repair the fracture will remain in the Plaintiff's body

permanently. (Beuchel Deposition Tr. p. 4.)

50. Following her release from Lutheran Hospital after surgery, the Plaintiff was admitted to St. Anne Home for rehabilitation where she remained for approximately three months during which she underwent physical therapy. (Tr. p. 91.)

51. Following her release from St. Anne Home rehabilitation center, the Plaintiff returned to her home where she required in-home health assistance twenty-four hours per day, seven days per week. This assistance was provided by Angel Corps., a home healthcare agency, as well as private healthcare providers. (Tr. pp. 92, 178.)

52. In addition to the in-home healthcare aids, Ruth Force, who is affiliated with Dorian Maples & Associates, a geriatric care management company, was engaged to assist in the management of Plaintiff's care. Ms. Force is certified in long-term care management which involves making decisions with respect to the need for care and the level of care of persons such as the Plaintiff. (Tr. pp. 173-176.)

53. Ms. Force has been familiar with the Plaintiff since 2010, as she and Mr. Henry were involved in the care of Plaintiff's late husband. (Tr. p. 176.)

54. Following her release from St. Anne Home, the Plaintiff had continued follow up medical treatments, including out-patient physical therapy which Ms. Force attended with her, as well as providing other services, all of which were necessary as a result of the Plaintiff's injury.

55. Dr. Beuchel continued to follow the Plaintiff after the initial surgery and noted that the fracture had not healed and that some of the screws were loosening. Because of the lack of healing, a second surgery was performed by Dr. Beuchel consisting of a bone grafting procedure. This procedure was performed in March 2017. (Beuchel Deposition Tr. pp. 5-8.)

56. Dr. Beuchel continued to follow the Plaintiff after the bone grafting surgery in March of 2017 and, when he last saw the Plaintiff on April 24, 2018, there was a persistent non-union where the fracture did not heal. (Beuchel Deposition Tr. p. 8.)

57. Following her release from the hospital after the bone grafting surgery, she returned home where she again required 24/7 in-home care. (Tr. p. 179.)

58. When her family cut back on the hours they were willing to pay for her in-home healthcare, the Plaintiff's anxiety and fear of falling was exacerbated to the point where she became suicidal and, in December of 2017, checked herself into Parkview BridgeWays to get psychiatric treatment. After that, it was determined that she could not live on her own at her home and she moved to an independent living facility at Arbor Glen in Fort Wayne in January of 2018. (Tr. pp. 183-184.)

59. The Plaintiff is currently confined to a wheelchair, although she is able to transfer herself to the toilet and shower and is able to transfer into the handicap accessible van, however, other than that, she is in her wheelchair. (Tr. p. 180.)

60. The Plaintiff continues to have a fear of falling and continues to receive therapy to address her anxiety and depression. (Tr. pp. 180-181.)

61. The Plaintiff's lack of mobility and reliance upon a wheelchair is permanent. (Beuchel Deposition Tr. p. 10.)

62. This permanent condition is a direct result of the injuries suffered by the Plaintiff in her fall at the Social Security Administration office on August 15, 2016. (Beuchel Deposition Tr. p. 10.)

63. Because of her permanent condition, the Plaintiff will never be able to live independently. (Tr. p. 185.)

64. The parties have stipulated that the Plaintiff incurred expenses for in-home nursing care/assistance in the total amount of $132,104.19. The Court finds that these expenses were reasonable in amount and necessary as a direct result of the injuries suffered by the Plaintiff in the subject fall.

65. The expenses incurred for services performed by Ruth Force, on behalf of the Plaintiff following her fall through August 31, 2020, were in the amount of $29,459.34. (Plaintiff's Trial Exh. 14.)

66. The services performed by Ms. Force will be required on a permanent basis as a result of the injuries suffered by the Plaintiff. Ninety percent (90%) of the charges, as reflected on Exhibit 14, would not have to be performed by Ms. Force, but for the injuries suffered by the Plaintiff in her fall. (Tr. pp. 188-189.)

67. The Court finds that, through August 31, 2020, the reasonable and necessary expense of the services performed by Ms. Force, as a direct result of Plaintiff's injuries, were in the amount of $26,513 ($757/month), and that the reasonable and necessary amount of Ms. Force's services, which will be required by the Plaintiff over her stipulated additional life expectancy, is in the amount of $143,073.

68. Currently, the Plaintiff receives two hours of care from Angel Corps. per week, primarily to take her to the grocery and assist her in transporting her groceries to her apartment. The Plaintiff was able to do this on her own prior to her fall. The cost per week of this service is $50 ($25/per hour) and this level of service, at a minimum, will be required on a permanent basis. (Tr. pp. 186-187.)

69. The Court finds that the reasonable and necessary cost of Angel Corps. assistance, over the

balance of Plaintiff's stipulated life expectancy, is in the amount of $41,132.

70. Because of her confinement to a wheelchair, Plaintiff requires the use of a wheelchair accessible conversion van to transport her. Prior to her fall, the Plaintiff and her husband owned a wheelchair accessible van which was used to transport her husband because of his disability. Following his death, the van was going to be sold. However, because of her injury and her need for such a van, it has been retained. The costs associated with maintaining the van, which but for Plaintiff's injuries would have been sold, include licensing, insurance and maintenance, and are in the approximate amount of $2,000 per year. Plaintiff will require this van, or a replacement wheelchair accessible van, on a permanent basis. (Tr. p. 182-183.)

71. The Court finds that the reasonable and necessary costs to maintain the wheelchair accessible conversion van, over the stipulated life expectancy of the Plaintiff, is in the amount of $39,640.

72. In January 2018, the Plaintiff moved from the home she had lived in with her husband, for twenty years, into an independent living facility called Arbor Glen. This move was necessary because of Plaintiff's inability to care for herself, her fear of falling, and her anxiety. (Tr. pp. 183-184.)

73. The costs associated with Arbor Glen, beginning in 2018, included an initial deposit of $3,285 and monthly rent from February of 2018 through December of 2018 in the amount of $2,009 per month. The rent was increased in 2019 to $2,124 per month and, in 2020, the monthly rental rate is $2,264. (Tr. p. 184,)

74. The house that Plaintiff had been living in prior to her fall was fully paid for. (Tr. p. 184.)

75. The Court finds that, but for Plaintiff's permanent injuries, she would have been able to continue living in her home and, although the home was paid for, it is reasonable to expect that the monthly cost, including taxes, insurance and necessary maintenance, would have been in the approximate amount of $500. The Court finds that the additional costs associated with Plaintiff's move to Arbor Glen is a direct result of Plaintiff's injuries and her inability to maintain her house as she was able to do prior to her fall. The additional cost incurred by the Plaintiff, from January 2018 through her stipulated life expectancy, is in the amount of $389,625.

76. Since her fall, the Plaintiff has undergone two significant surgeries, extended periods of rehabilitation and physical therapy, and has experienced the pain and anxiety that naturally accompanies such a course of medical treatment. Her anxiety and depression caused suicidal thoughts resulting in hospitalization and ongoing therapy. The Court finds that reasonable compensation for the pain, anxiety and emotional distress caused by the injury, treatment and therapy to date, is in the amount of $100,000.

77. Prior to her fall, the Plaintiff had lived with her husband, until his death in July of 2016, for approximately twenty years in a home on Stinson Drive in Fort Wayne, Indiana. She not only

maintained this property, including walking up and down stairs to do laundry, cooking, and other daily activities associated with her home, but she also helped care for her invalid husband who was confined to a wheelchair. (Tr. pp. 11-12, 177.)

78. Prior to her fall, the Plaintiff enjoyed walking every day and the independence that it provided to her to be out on her own. She would often walk many miles when shopping, as well as engaging in other activities. Although she was diagnosed with osteoarthritis in her knees, this condition did not restrict her in her ability to walk on a daily basis and she did not, prior to her fall, require any walking assistance, such as canes or walkers. (Tr. pp. 13, 14, 82, 83, 177.)

79. Because of her injuries, the Plaintiff has an intense fear of falling and is no longer independent, as she is now dependent on others to do for her that which she was able to do for herself before her fall. (Tr. pp. 33, 180, 181.)

80. Her confinement to a wheelchair and her dependence on others, as well as the loss of the enjoyment she had in being able to walk every day, is permanent. Over her stipulated additional life expectancy, the reasonable value of that which has been taken from her, as a result of her injuries, is no less than $100 per day, or $577,430 for the remaining years of her life.

81. On a typical day prior to Plaintiff's fall, she would walk to Walmart and would be out of the house from approximately 10:00 a.m. until 4:00 or 5:00 p.m. (Tr., pp. 13-14, 73, 83, 176-177.). On days she did not walk, or when the distance was too far to walk, she would take the Citilink bus. (Tr., pp. 14, 73.)

82. Plaintiff did some household chores, including laundry, cleaning up the kitchen, and grocery shopping, and helped care for her husband before his passing. (Tr., pp. 76, 84.)

83. After Plaintiff's fall, she was diagnosed with fracture of distal end of femur. (Plaintiff's Trial Exh. 8, p. 4.)

84. Plaintiff underwent surgery for repair of the femur fracture. (Tr., pp. 25, 90-91.)

85. Following Plaintiff's surgery Mr. Henry arranged for Plaintiff to stay in St. Anne's rehabilitation center. (Tr., pp. 26, 91.)

86. Plaintiff returned home in October 2016 and had continuous care in her home. (Tr., pp. 26, 28, 91-92.)

87. Mr. Henry engaged Ruth Force to assist in Plaintiff's care. (Tr., p. 92.) Ms. Force eventually took over Plaintiff's care. (Tr., p. 93.)

88. By February 21, 2017, Plaintiff reported to Dr. Beuchel that her pain was only a 1 out of 10. (Beuchel Depo., p. 29.) And, in March 2017, she reported her pain was a 0 out of 10. (*Id*.)

89. Although her condition improved, Plaintiff underwent a second surgery for a bone graft due to the non-union of the femur fracture site in March 2017. (Tr., pp. 27-28, 92-93.)

90. Following this surgery Plaintiff required in home assistance for approximately three to four months. (Tr., p. 29.)

91. In 2017, Angel Corps began providing services to Plaintiff that included getting Plaintiff out in the community so that she "didn't become a hermit." (Tr., pp. 29-30.) This included shopping and errands. (*Id*.)

92. Plaintiff continues to go to the stores and shops in a wheelchair. (Tr., pp. 93-94.)

93. Plaintiff originally received 24/7 care from Angel Corps for approximately one year. (Tr., pp. 73-74.)

94. Her trust fund subsequently cut back the care Plaintiff received from Angel Corps to 15-20 hours a week because her family felt that she no longer needed constant care. (Tr., pp. 73-74,16-17.)

95. Angel Corps now provides services to Plaintiff one day a week. (Tr., p. 74.)

96. Plaintiff continues to take the Citilink bus when Angel Corps is not present. (Tr., p. 30.)

97. Plaintiff moved into an independent living community, Arbor Glen, in January 2018. The community provides meals and cleans Plaintiff's apartment. (Tr., p. 32.)

98. Plaintiff is in a wheelchair and able to transfer to the toilet, shower, and bed, cook, and take care of her hygiene by herself. (Tr., p. 180.)

99. Plaintiff kept and maintains a wheelchair accessible van that was previously used by her husband. (Tr., pp. 33, 93-94.)

100. By April 2017, Dr. Beuchel told Plaintiff to weight bear as tolerated, but encouraged her to use a walker or assistance. (Beuchel Depo., p. 3.)

101. At this point, Dr. Beuchel does not believe Plaintiff will walk due to pain. (Beuchel Depo.)

**The Court finds that the preceding facts 1 through 101 are true based on the stipulations of the parties, the preponderance of the evidence and the testimony presented at trial.**

13

### III. Conclusions of Law.

### A. Bassuk Proved the Elements of Her FTCA Claim.

The Federal Tort Claims Act provides that the United States is liable for money damages for personal injury caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his or her employment if a private person would be liable to the claimant under the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1).

The tort law of the state where the tort occurred, in this case Indiana, applies when determining "'whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries.'" *Gilmore v. Decker*, No. 16-CV-209, 2020 WL 1443198, at *9-10 (S.D. Ind. Mar. 25, 2020) (quoting *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008)). Under Indiana law, Bassuk must prove (1) that the United States owed a duty to her; (2) that the United States breached that duty; and (3) that the breach proximately caused her injuries. *Id*. (citing *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016); *Brown v. United States*, 737 Fed. Appx. 777, 780 (7th Cir. 2018)).

It is well established under Indiana law that a property owner must exercise reasonable care to maintain its property in a reasonably safe condition for business invitees (such as Bassuk). *Pelak v. Ind. Indus. Servs., Inc.*, 831 N.E.2d 765, 769 (Ind. Ct. App. 2005). Indiana courts have adopted the Restatement (Second) of Torts, Section 343, which provides that a possessor of land is subject to liability for harm caused to an invitee by condition of the land if: 1) it knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to such invitee; and 2) it should expect that an invitee will not

14

discover or realize the danger or will fail to protect herself against it; and 3) it fails to exercise reasonable care to protect the invitee against the danger. *Smith v. Baxter*, 796 N.E.2d 242, 244 (Ind. 2003). While a landowner or possessor must have knowledge of the dangerous condition before liability can be imposed, this knowledge can be actual or constructive. Constructive knowledge has been found where a dangerous condition "has existed for such a length of time and under such circumstances that it would have been discovered in time to have prevented injury if a storekeeper, his agents or employees had used ordinary care." *Wal-Mart Stores, Inc. v. Blaylock*, 591 N.E.2d 624, 628 (Ind. Ct. App. 1992).

In the present case, the United States argues that Bassuk failed to establish the second and third elements of her negligence claim (the first element–that the SSA owed a duty to Bassuk–is not disputed). The preponderance of the evidence, however, says otherwise. Bassuk slipped and fell on the wet floor of the vestibule in the Social Security office. It had been raining most of the morning and was still misting at the time Bassuk arrived. It was a busy Monday morning at the Social Security office. The floor of the vestibule was wet from patrons tracking water into the vestibule for 2 ½ hours before Bassuk arrived. It is undisputed that no Social Security office employee or cleaning company or security guard attempted to clean or dry the floor in the vestibule between the time the building open to the public at 9:00 a.m. and the time Bassuk fell at approximately 11:30. It is undisputed that there was no warning sign in the vestibule; the only warning sign was in the lobby and was not visible to patrons like Bassuk as they entered the vestibule. The preponderance of the evidence, including Bassuk's testimony, which the Court found to be credible, establishes that Bassuk fell because she slipped on the wet floor. The United States has argued all along that Bassuk fell because she had arthritic knees and not as a

15

result of the wet floor in the vestibule. In support of this argument, the United States relies on the

evidence that Bassuk had been diagnosed with arthritis in her knees, had fallen on prior

occasions, and stated to the responding paramedic that her "knee gave out." The United States

insists that its argument presents "a plausible scenario consistent with the arthritic condition of

[Bassuk's] left knee and a prior fall onto her left knee at a Walgreens less than a year earlier."

Defendant's Post-Trial Brief (ECF No. 59), p. 1. The United States is correct that its theory is

"plausible," but "preponderance" beats "plausible" every time, and that is the case here. The

preponderance of the evidence presented at trial established that the Defendant had either actual

or constructive knowledge of the condition of the vestibule floor prior to Bassuk's fall; that

Defendant breached its duty of care; and that the breach was the proximate cause of Bassuk's fall

and her resultant injuries.

### B. Determination of damages.

As this Court has explained:

> [T]he person injured by the negligence of another is entitled to reasonable
> compensation. *Kavanagh v. Butorac*, 140 Ind. App. 139, 221 N.E.2d 824, 828
> (1966). Courts have said that term means such sum as would reasonably
> compensate the victim both for bodily injuries and for pain and suffering. *Id*. To
> that sum is added past, present, and future expenses reasonably necessary to the
> plaintiff's treatment and all financial losses suffered, or to be suffered, as a result
> of the inability to engage in his usual occupation. *Id*. "Compensation is the stated
> goal of a court when measuring damages for personal injuries." *Id*. (citation
> omitted).The question, as is so frequently raised in personal injury actions, is how
> much money reasonably compensates [victims] for their injuries and pain and
> suffering.

*Huegel v. Wal-Mart Stores, Inc.*, No.16-CV-1, 2016 WL 5929257, at *2 (N.D. Ind. Oct. 11,

2016) (quoting *Ritter v. Stanton*, 745 N.E.2d 828, 843 (Ind. Ct. App. 2001)).

When determining the amount of money that will fairly and adequately compensate a

Plaintiff for the damages she has incurred and will incur in the future, Indiana law provides that

the Court should consider the following:

1. The reasonable value of necessary medical care, treatment and services Plaintiff incurred and will incur in the future as a result of her injuries. *Smith v. Syd's, Inc.*, 598 N.E.2d 1065 (Ind. 1992).

2. The nature and extent of the Plaintiff's injuries and the affect of the injuries on her ability to function as a whole person. *Canfield v. Sandock*, 563 N.E.2d 1279 (Ind. 1990).

3. Whether her injuries are temporary or permanent. *Indianapolis S.R. Co. v. Walton*, 64 N.E. 630 (Ind. App. 1902).

4. The physical pain and mental suffering the Plaintiff has experienced and will experience in the future as a result of her injuries. *Ritter v. Stanton*, 745 N.E.2d 828, 845 (Ind. Ct. App. 2001) ("'Physical and mental pain are, by their very nature, not readily susceptible to quantification, and, therefore, the [trier of fact] is given very wide latitude in determining these kinds of damages.'") (quoting *Landis v. Landis*, 664 N.E.2d 754, 757 (Ind. Ct. App. 1996)).

5. The Plaintiff's life expectancy. *Stauffer vs. Lothamer*, 419 N.E.2d 203 (Ind. Ct. App. 1981).

Bassuk argues for an award of damages as follows:

[T]he evidence establishes by a preponderance that the Plaintiff has, as a direct result of the Defendant's negligence, suffered substantial and permanent injuries which have had a profound and permanent affect on her ability to enjoy life as she had before she fell at the Social Security Administration office on August 15, 2016. In assessing reasonable compensation for the damages she has suffered and will suffer in the future, the Plaintiff is entitled to recover the following:

1. The reasonable value of medical treatment and home care assistance incurred to date in the amount of $221,340.12.

2. The reasonable and necessary value of the services to be performed by Ruth Force and Angel Corps. over the balance of the Plaintiff's life in the amount of $184,205.

3. The additional living costs associated with the Plaintiff's inability to continue living in her home since the accident and for the balance of her life in the amount of $389,625.

4. Additional costs associated with ownership and maintenance of a wheelchair accessible conversion van, both past and for the balance of Plaintiff's life, in the amount of $39,640.

5. The physical pain and emotional distress suffered by the Plaintiff from the date of her fall to the present in the amount of $100,000.

6. The lifetime inability to function as a whole person and the loss of independence because of confinement to a wheelchair in the amount of $577,430.

The total amount of Plaintiff's damages, directly resulting from Defendant's negligence which has been established by a preponderance of the evidence in this case, is in the amount of $1,512,240.12. Because the Plaintiff's Notice of Claim for Damages, Injury or Death filed against the Social Security Administration on May 14, 2018, demanded damages in the amount of $1,000,000, judgment should be entered in favor of the Plaintiff and against the Defendant in the amount of $1,000,000.

Plaintiff's Post-Trial Brief (ECF No. 57), pp. 12-19. Bassuk's Post-Trial Brief sets forth in detail

her calculation of these damage amounts. *Id*. The Court concludes that the damages sought are

reasonable and necessary to compensate Bassuk for her injuries based on the evidence. The

preponderance of the evidence supports the Court's findings that Bassuk's injuries are serious

and permanent. But while Bassuk has supported her calculation of damages in the amount of just

over $1.5 million, she concedes that she is *not* entitled to recover an amount above that which

she requested in her tort claim notice, i.e., $1,000,000. As another district court explained:

Statutes like the FTCA in which the government waives its sovereign immunity "must be construed strictly in favor of the [government] and not enlarge[d] . . . beyond what the language requires." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). Under the FTCA, Zurba was required to present her claim to the appropriate administrative agency before bringing suit. 28 U.S.C. § 2675(a). *The law generally bars a plaintiff from pursuing an action for an amount greater than the amount stated in her administrative claim. Id*. § 2675(b).

*Zurba v. United States*, 247 F. Supp. 2d 951, 957 (N.D. Ill. 2001), aff'd, 318 F.3d 736 (7th Cir.

18

2003) (italics added). Accordingly, the Court awards damages to Bassuk in the amount stated in her tort claim notice.

Bassuk, having proved her negligence claim by a preponderance of the evidence, is entitled to recover damages for her injuries. The United States, however, argues that "even if the United States has liability, Plaintiff has not shown that her damages are as high as she claims." Defendant's Post-Trial Brief, p. 20. The United States concedes that "Medicare, Blue Cross, and Plaintiff directly paid just over $62,000 in medical bills for Plaintiff's surgeries, ambulance, rehabilitation services, etc. *These services all appear related to the fall*. However, Plaintiff additionally demands reimbursement for the funds she has paid Angel Corps to date, as well as services she anticipates for the rest of her life. She has not shown that these services were or are medically necessary or were proximately caused by Plaintiff's fall." *Id*. (italics added). The United States argues that Bassuk is entitled to receive "just over $62,000, plus some modest sum for home health services." *Id*. The United States further argues that Bassuk should not recover additional amounts for pain and suffering, reimbursement for her independent living facility, or reimbursement for her handicap van because she "testified that she is able to take the Citilink bus" and "has not demonstrated that the expense of the van is necessary or was proximately caused by her fall. Thus, *even if the Court were to deem Defendant partially liable, Plaintiff's damages are far lower than the $1 million she demands*." *Id*., p. 22 (italics added).

Bassuk responds by pointing out that "[a]lthough the Defendant argues that Plaintiff's damages are far lower than the $1,000,000 she demands, it offers no suggestion to the Court as to what a reasonable amount is to compensate her for all of her damages." Plaintiff's Post-Trial Reply Brief (ECF No. 61), p. 8.

The Court finds the Defendant's argument unavailing. Bassuk established the elements of her negligence claim. She also proved her entitlement to damages to compensate her for her injuries. The preponderance of the evidence proved that Bassuk suffered a broken leg as a result of the fall, had two surgeries to repair damage to the knee. Dr. Beuchel testified that the damage to Bassuk's knee is permanent and that she will never be able to walk again as she did before the fall. The preponderance of the evidence established that Bassuk will have to live in an assisted living facility for the remainder of her life since she is unable to live independently, notwithstanding the Defendant's insistence that she "able to cook, transfer from her wheelchair, and perform other necessary activities to care for herself." *Id*., p. 21. While it is true that Bassuk is able to cook and transfer herself from her wheelchair to bathe or use the toilet, the preponderance of the evidence, including Bassuk's testimony, Dr. Beuchel's testimony and the medical records, establish that her ability to care for herself on a daily basis and to ambulate as she did before the accident are severely and permanently impaired as a result of her fall. Based on the above findings of fact and conclusions of law, the Court determines that Bassuk has proved that her requested damages award of $1,000,000 is reasonable and necessary to compensate her for: 1) medical care, treatment and services she  incurred and will incur in the future as a result of her injuries; 2) the nature and extent of her injuries and the affect of those injuries on her ability to function as a whole person; 3) the fact that her injuries are permanent; and 4) the physical pain and mental suffering she has experienced and will experience in the future as a result of her injuries.

The Court concludes that Bassuk has proved by a preponderance of the evidence that her injuries were proximately caused by the Defendant's negligence and that the damages she

requests are reasonable and medically necessary to enable her to live as comfortably as possible for the remainder of her life.

## CONCLUSION

For the reasons set forth above, the Court rules in favor of the Plaintiff on her claim for negligence, enters judgment in favor of Plaintiff Adrienne Bassuk and against Defendant United States of America, and awards damages to Plaintiff in the amount of $1,000,000.

Date: December 7, 2020.

　/s/　William C. Lee　
William C. Lee, Judge
U.S. District Court
Northern District of Indiana

21